**(NOT FOR PUBLICATION)**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Ammed Hassan,

    Petitioner,

v.

Charles L. Ryan, et al.,

    Respondents.

No. CV-18-02628-PHX-SRB

**ORDER**

The Court now considers Petitioner Ammed Hassan ("Petitioner")'s pro se Petition for a Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 ("Petition"). (Doc. 1, Pet.) The matter was referred to Magistrate Judge Camille D. Bibles for a Report and Recommendation.

## I. BACKGROUND

### A. Factual Background

The background of this case was thoroughly summarized in the Report and Recommendation and is incorporated herein:

> A. Summary of evidence presented at trial
>
> The following background is taken from the Arizona Court of Appeals' decision in Hassan's appeal:
>
> > In the late evening hours of October 21, 2011, police were notified . . . that an alarm was going off in the victim's home. Upon arriving at the home, Detective Dowlen of the Scottsdale Police Department ["SPD"] observed a man near the home holding a shoebox. After Dowlen had a brief look at the man's face, the man took off running, dropping the shoebox. Dowlen then gave chase on foot.

|   |   |
|---|---|
| 1 | Although the man was able to evade capture, in the course of the chase a baseball cap flew off his head. As Dowlen returned to the house, he retrieved the cap from the ground. It was later determined that Hassan's DNA was on the interior band of the cap. |

> Although the man was able to evade capture, in the course of the chase a baseball cap flew off his head. As Dowlen returned to the house, he retrieved the cap from the ground. It was later determined that Hassan's DNA was on the interior band of the cap.
>
> A short distance from the victim's house, police discovered the shoebox that was dropped by Hassan during the police pursuit. The box contained several pieces of costume jewelry that belonged to the victim.
>
> In the course of the investigation, police located Hassan's truck parked at the clubhouse of the golf course adjacent to the victim's home. The officers eventually placed a GPS tracker on Hassan's truck.
>
> A photo lineup containing a photo of Hassan was compiled and shown to Dowlen. Dowlen immediately identified Hassan from the lineup, expressing his belief that Hassan was the man he had chased earlier.
>
> The next day, Hassan retrieved his truck, and police followed him to the hotel where he was staying. Upon his arrival at the hotel, Hassan was arrested by the police. . . . At trial, Dowlen identified Hassan as the suspect he saw running from the victim's house.

*State v. Hassan*, 2013 WL 3963449, at *1-2 (Ariz. Ct. App. 2013).

A primary component of Hassan's defense was his allegation that the [SPD] suspected him of criminal activity prior to the events of October 21, 2011, and they had, accordingly, attached a GPS device to his truck months prior to that date, and the GPS device caused his truck to malfunction. Members of the [SPD] testified at Hassan's trial. These law enforcement officers testified that [] from approximately February through August of 2011 they had, with court orders, placed GPS devices on Hassan's truck and his wife's van to monitor Hassan's activities. A sergeant testified they had initially placed a hardwire GPS device on Hassan's truck and that they had placed "maybe three or four" GPS devices on Hassan's wife's van, because "he kept finding them." A detective, the police sergeant, and a police officer all testified that the two types of GPS devices used by the [SPD] (a "hard-wired" device and a magnetic device) would not have impacted the mechanical functioning of his truck. The sergeant also testified the [SPD] had been conducting visual and GPS surveillance of Hassan "for some time" because he was suspected of committing residential burglaries. On cross-examination, defense counsel, utilizing the police department's GPS logs, elicited testimony from the sergeant that there was a hard-wired GPS device on Hassan's truck on "October 6," 2011, the "last date" in that GPS log which began May 25, 2011. However, upon redirect, the State noted the dates on the log of the hard-wired GPS unit on Hassan's truck were "25-5-2011," and "10-6-2011," i.e., that the true actual date of the latest log entry was June 10, and not October 6. All of the [SPD] officers and detectives testified that there was no GPS device on Hassan's truck on October 21, 2011. The sergeant further testified that some weeks prior to

- 2 -

October 21, 2011, the [SPD] had "pretty much given up" on surveilling Hassan because they believed he had left the state. Defense counsel elicited testimony that the police never identified a crime occurring at any of the addresses logged on the GPS reports.

A police detective testified that a towing company towed Hassan's truck from the scene of his arrest; that the truck was towed to the police station to complete an inventory of the contents of the truck; and that the truck was then turned-over to the "tow yard" and "permanently impounded." The detective responsible for the vehicle testified that all of the inventoried items were left in the truck; that the truck was then towed by All City Towing to its impound yard; and that after the requisite 24-hour holding period the [SPD] did not have any control over the truck.

Hassan testified at his trial. Hassan testified that he believed he began being visually surveilled by the [SPD] in October or November of 2010, and that the police later began placing GPS devices on his truck and his wife's van. Hassan believed the GPS device was interfering with the proper functioning of his truck's fuel pump. He testified that on the night of October 21, 2011, he was traveling to meet a mechanic who could remove the GPS device from Hassan's truck. Hassan testified that, while on his way to meet the mechanic, his truck began to stall so he pulled over and began pushing the truck off the road. He further testified that as he began to push the truck, "two kids" who were walking on the road began helping him push the truck, and they pushed the truck into the parking lot of a golf course. Hassan testified he then walked to a shopping center at Shea Boulevard and Scottsdale Road, where he used a pay phone to call the mechanic. He testified that he could not reach the mechanic, and he then tried "his girl's phone number." Hassan testified a Spanish-speaking woman answered the call and her daughter translated the conversation from English to Spanish. He further testified the woman came and picked him up at the shopping center and drove him to a light-rail station, where he caught transportation back to his motel. ("[S]he said, well we're not that far away. We're dropping [the mechanic] off at his other job, and we can come and pick you up." "Because they were supposed to come and pick me up and take me to Mesa, but they didn't do that. What they ended up doing was picking me up and dropping me off at the el train near the state fair . . . ."). On cross-examination Hassan testified that when he tried the mechanic's "girl's phone number," "[a]t first I didn't get through, but then I made another phone call to another friend of mine to try to get a ride. So then I called her one more time, and I actually got through." On cross-examination Hassan testified that he did not use his cell phone to call for a ride because the cell phone was a "minute phone," which "had like two minutes left." Hassan testified that the next morning he "contacted a friend" who gave him a ride to collect a part for his truck; that after acquiring the part he took a bus back to his truck, and that when he got back to his truck it started immediately without the new part being installed.

Hassan flatly denied he committed the alleged crime. He further testified he had a foot deformity which rendered him physically unable to run from the police as alleged. Prior to Hassan's testimony defense counsel successfully precluded the introduction of

Hassan's prior out-of-state convictions for "multiple burglaries" as too remote, and stipulated to the admission of a prior non-remote non-specific felony conviction. At the close of the prosecution's case defense counsel moved for an acquittal, arguing the State's "evidence boils down to a very shaky eyewitness ID . . . [Detective Dowlen] blatantly contradicted himself about not just the race, but the size of the" suspect when identifying Hassan in the photo line-up, and argued that the size of the DNA sample linked to Hassan was "an extremely small quantity." The Rule 20 motion was denied. During its case on rebuttal, the State again elicited testimony from a [SPD] detective that the police department, acting with a court order, placed a GPS surveillance device on Hassan's truck "after February 20, 2011." The State referenced a trial exhibit, "the first and last page of the hardwired GPS log," indicating the device was working from May 25, 2011, through June 10, 2011, and that the device was removed on or about August 2, 2011. The detective testified: "Once he left the State, we were done, because we believed he moved. And that's why we got our tag back from Ohio PD, off his wife's car. And we had our tag back from his truck. We were done." Defense counsel questioned the detective regarding the inventory of Hassan's vehicle at the time it was towed and before it was impounded, noting the police inventory listed the items found in the truck as "Blue backpack . . . DVD, miscellaneous clothing, car battery charger . . . wallet with Hassan's Arizona driver's license, Hassan's TEF Bank checkbook, pair of Dickeys work boots . . . Samsung Boost mobile cell phone."

B. State appellate and Rule 32 proceedings

The jury found Hassan guilty of burglary in the second degree. . . . . . . [T]he trial court held a hearing [and] . . . determined that Hassan had a total of five prior convictions. . . .

The trial court sentenced Hassan to a term of 13 years, and imposed an additional 2 years because the offense was committed while he was on pretrial release, making a total of 15 years. A.R.S. § 13–708(D). He was given credit for 312 days served [and] ordered to pay $700 in restitution to the victim.

*Hassan*, 2013 WL 3963449, at *1-2.

Hassan filed a timely notice of appeal. Hassan's appointed counsel found no colorable claims to raise on his behalf and filed an *Anders* brief. Hassan filed a pro per brief, asserting Detective Dowlen's identification of him as the perpetrator of the crime was unreliable and the photo line-up was unduly suggestive. *Hassan*, 2013 WL 3963449, at *2. Hassan also alleged the prosecution "used perjured testimony by several police officers" and "denied him access to witnesses during discovery." *Id.* He also asserted "his counsel failed to interview certain witnesses," "he should have received a *Willits* instruction, contending the police destroyed evidence in bad faith . . .", and a Fourth Amendment claim regarding the search of his motel room after his arrest[.] *Id.*

The Arizona Court of Appeals affirmed Hassan's conviction

and sentence in a memorandum decision. *Id.* at *1-5. The appellate court held the "mere fact" of some evidence challenging the reliability of the Detective Dowlen's identification did not constitute reversible error, and substantial evidence supported the reliability of the detective's identification of Hassan as the perpetrator of the crime. The appellate court found no evidence that the photo lineup was unduly suggestive and that this issue was waived because the defense never moved to suppress the identification. *Id.* at *2. The court further concluded Hassan failed to establish that police officers perjured themselves at trial, finding "such contentions merely go to the weight and credibility of these witnesses, and do not, in light of all the evidence in this case, constitute reversible error, much less proof of perjury." *Id.* The appellate court also found Hassan's *Willits* claim waived and without merit, concluding Hassan "has not shown that the potential exculpatory value of the evidence was more than speculative, nor has he shown that he was prejudiced. In short, Hassan has shown nothing that would entitle him to a *Willits* instruction, nor is there anything on the record to support this claim." *Id.* at *3. The appellate court held Hassan waived his Fourth Amendment claim. *Id.*

A motion for reconsideration was denied and the Arizona Supreme Court denied a petition for review.

Hassan filed a timely notice of post-conviction relief pursuant to Rule 32, Arizona Rules of Criminal Procedure, and was appointed counsel. Hassan's post-conviction counsel reviewed the record and concluded she was unable to "discern any colorable claim upon which to base a Petition for Post-Conviction Relief." Hassan filed a pro per Rule 32 petition, alleging nineteen claims of ineffective assistance of trial and appellate counsel. The state trial court summarized his claims as follows: "Defendant [contends] counsel failed to do the following: thoroughly investigate his case; object to certain witnesses, felony convictions, and other evidence; withdraw a jury instruction (sic); and communicate with the defendant regarding trial strategy. Defendant also complained that appellate counsel failed to raise certain arguments . . . [.]" In an order issued January 26, 2015, the state trial court summarily dismissed Hassan's petition. The court concluded Hassan failed to demonstrate his trial or appellate counsel's performance was deficient or that he suffered any prejudice. Hassan sought a rehearing, which was denied on September 26, 2015.

Hassan petitioned the Arizona Court of Appeals for review. In his petition he asserted, inter alia, that the State failed to comply with the defense's request to disclose the complete logs from the GPS devices. Hassan argued: "The evidence is material in that it supports appellant's alibi, as in going to have a GPS device removed from his truck the night of the incident." He also asserted additional claims for relief than those stated in his Rule 32 petition to the trial court:

> (1) the police did not preserve requested exculpatory alibi evidence in bad faith violating due process; (2) the trial court failed to comply with Arizona Rule of Evidence 609 which prejudiced Hassan because his prior felony conviction was used to impeach him and opened the door for other aggravator findings by the trial court; (3) the trial court took judicial notice of evidence in violation of A.R.S. § 13-708(D) and the State

illegally built its allegations of historical prior felony convictions on this evidence to enhance his sentence; (4) the trial court erred in its ruling on a discovery request; (5) trial and appellant counsel failed "to move or take action on appellant's behalf."

In a decision issued October 10, 2017, the Court of Appeals granted review but summarily denied relief. *State v. Hassan*, 2017 WL 4508314 (Ariz. Ct. App. 2017). The Arizona Supreme Court denied review and a motion for rehearing.

C. Hassan's federal habeas claims

Hassan asserts he is entitled to federal habeas relief because:

1. A third-party destroyed alibi evidence.

2. He was unable to gather evidence material to his innocence.

3. He was denied his rights pursuant to *Apprendi* and *Blakely*.

4. He was improperly impeached by the use of a prior conviction.

5. He was denied the effective assistance of trial counsel. Hassan asserts his counsel:

   a. improperly opened the door to his prior convictions;

   b. failed to ascertain Hassan's prior Michigan conviction was not a felony in Arizona and could not have been used to impeach him;

   c. failed to exclude Detective Dowlen's in-court identification;

   d. failed to acquire the complete GPS logs;

   e. failed to assert the State had destroyed his "access to alibi witnesses," i.e., his cell phone;

   f. failed to assert the police failed to collect the "culprit[']s shoe prints."

   g. failed to present the jury with evidence of police misconduct;

   h. forfeited his entitlement to a *Willits* instruction;

   i. "released all subpoenaed witnesses that he agreed to call who supported police misconduct theory;" and

   j. "changed the theory of the case from 'police set Hassan up' to []drug addicted nephews may have committed the crime without evidence to support the theory."

> Respondents contend Hassan's claims are vague and conclusory, not cognizable, procedurally defaulted, and without merit.

(Doc. 38, R. & R. at 1–9 (footnotes and record citations omitted).)

**B.    Procedural Background**

On August 30, 2019, the Magistrate Judge filed her Report and Recommendation, recommending that the Petition be denied. (*See id.* at 40–42.) The Report and Recommendation concludes that Grounds One, Two, Three, Four, and the unexhausted claims in Ground Five should be denied on the merits, and that state courts did not err in denying Petitioner's exhausted claims in Ground Five. (*See id.* at 14–40.) The Magistrate Judge further recommends denying a certificate of appealability because Petitioner has not made a substantial showing of the denial of a constitutional right. (*Id.* at 41.) Petitioner untimely objected, but the Court considers his Objections nonetheless.[1] (*See* Doc. 39, Obj. to R. & R. ("Obj.").)

**II.    LEGAL STANDARDS**

A district court "must make a de novo determination of those portions of the report . . . to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1)(C). A court need review only those portions objected to by a party, meaning a court can adopt without further review all portions not objected to. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc). For those portions of a Magistrate Judge's findings and recommendations to which neither party has objected, the Act does not prescribe any standard of review. *See Thomas v. Arn*, 474 U.S. 140, 152 (1985) ("There is no indication that Congress . . . intended to require a district judge to review a magistrate's report to which no objections are filed."); *Reyna-Tapia*, 328 F.3d at 1121 ("[T]he district judge must review the magistrate judge's findings and recommendations

---

[1] Respondents urge the Court to disregard Petitioner's Objections because they were filed seven days late, on September 20, 2019. (*See* Doc. 40, Resp. to Obj. ("Resp.") at 1–2.) The Court construes pleadings filed by unrepresented parties liberally. Moreover, Respondents have not been substantially prejudiced by the fact that Petitioner filed his Objections late, and have had a reasonable opportunity to respond to his arguments.

de novo *if objection is made*, but not otherwise.").

**III.  ANALYSIS**

Petitioner objects to the Report and Recommendation on three grounds. With respect to Ground One, Petitioner maintains that the destruction of requested evidence violated his Fourteenth Amendment due process rights, and objects to the Report and Recommendation's conclusion that he has failed to demonstrate as much. (*See* Obj. at 3.) With respect to Ground Two, Petitioner argues that "suppressed GPS logs" from his truck would show that the police are in error and were in fact tracking him via GPS on the date of the burglary. (*See id.* at 11.) With respect to Ground Three, Petitioner objects to the Report and Recommendation's conclusion that his enhanced sentence does not conflict with *Apprendi v. New Jersey*[2] or *Blakely v. Washington*.[3] (*See id.* at 13.)

**A.  Ground One**

According to Petitioner, the destroyed evidence—a map[4] and cell phone located in his truck—could have served as "material exculpatory evidence," and the prosecutor's failure to "disclose or preserve the evidence" limited Petitioner's capacity to defend himself. (*Id.* at 3.) Without his phone, Petitioner argues, he could not verify his purported alibi: a girl who helped fix his flat tire while the burglary was taking place.[5] (*See id.* at 6.) Petitioner argues that the destruction of the map and phone constitutes a due process violation in light of *California v. Trombetta*. (*Id.* at 7 (discussing *Trombetta*, 467 U.S. 479 (1984))); *see Trombetta*, 467 U.S. at 489 ("To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.") (citation omitted).

---

[2] 530 U.S. 466 (2000).
[3] 542 U.S. 296 (2004).
[4] Petitioner claims that because the mechanic's contact information (including the repair shop's address) was written on the one-page map, it is crucial to contacting the mechanic. The defense investigator was unable to find the mechanic based on Petitioner's statement that the mechanic lived in Petitioner's former apartment complex in Mesa. (*See* R. & R. at 22–23.)
[5] According to Petitioner, the "girl who helped with the truck's flat tire sent a text" which was on the destroyed phone, and he "could not get a printout [of the text conversation] without SIM card SID." (Obj. at 8.)

- 8 -

But Petitioner's Objections are riddled with inconsistencies regarding the benefit of any information that might have been gleaned from either the missing map or his phone. For example, although Petitioner argues that the failure to secure the mechanic's testimony was fatal to his case, the allegedly exculpatory value of the mechanic's testimony hinges on several increasingly improbable contingencies. Petitioner "only speculates as to the potentially exculpatory nature of the information contained in the phone, i.e., that even if the phone had been retrieved, the purported alibi witnesses could have been located, would have been willing to testify, and would have testified as to [Petitioner]'s version of events." (R. & R. at 21.) Significantly, Petitioner does not rebut this conclusion.

Indeed, Petitioner actually makes the case against the mechanic testifying: "[t]he mechanic . . . was a[n] undocumented worker and avoids contact with 'police looking investigators.'" (Obj. at 8.) Petitioner states that his "first conversation [with the mechanic] required a translat[o]r," and that the mechanic offered slang terms that describe Mexican males ("pizza" or "paroo") in lieu of his actual given name. (*Id.*) Petitioner further notes that the mechanic may not have been authorized to be at the auto shop at that hour. (*Id.*) The Court therefore agrees with Respondents: "[g]iven this description, it is unlikely that this purported witness [the mechanic] would have appeared or testified on [Petitioner's] behalf at trial—so any contact information for this witness would not have produced exculpatory evidence." (Resp. at 4.)

In sum, Petitioner's muddled statements and arguments do nothing to establish a violation of *Trombetta*. *See Trombetta*, 467 U.S. at 489. Petitioner makes "no colorable showing that the [SPD], or the towing company acting at the behest of [SPD], acted to prevent disclosure of favorable evidence to the defense," nor is there any reason to believe that the map or phone had any exculpatory value that was apparent prior to their destruction. (*See* R. & R. at 24.) "Absent a showing of bad faith on the part of the police, 'failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" *Phillips v. Woodford*, 267 F.3d 966, 986–87 (9th Cir. 2001) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)); *see also United States v. Hernandez*, 109 F.3d 1450,

1455 (9th Cir. 1997) ("The mere failure to preserve evidence which could have been subjected to tests which might have exonerated the defendant does not constitute a due process violation.") (citations omitted). Not only has Petitioner failed to demonstrate bad faith on the part of the SPD, he has not even demonstrated that the destroyed evidence was "potentially useful." *Youngblood*, 488 U.S. at 58. At best, Petitioner has suggested that the map and phone were of "'speculative' materiality." (R. & R. at 24 (quoting *Hamblin v. Mitchell*, 354 F.3d 482, 495 (6th Cir. 2003).) But speculative materiality does not rise to the level of exculpatory for purposes of *Trombetta*—"particularly where there is substantial evidence of [Petitioner]'s guilt." (*See* R. & R. at 24.)

Petitioner also raises a new Fourth Amendment claim—that the SPD violated his right to be free from unreasonable search and seizure. (*See* Obj. at 10.) Because he did not raise this claim in his Petition, and has not sought leave to amend his Petition, the Court declines to consider this claim. *See United States v. Howell*, 231 F.3d 615, 621–23 (9th Cir. 2000). The Court also notes that because Fourth Amendment claims are generally not cognizable in federal habeas, there would be little value in permitting amendment because Petitioner does not argue that he lacked a "full and fair opportunity" to litigate this claim. *See Stone v. Powell*, 428 U.S. 465, 493–95 (1976); *Newman v. Wengler*, 790 F.3d 876, 880 (9th Cir. 2015) (per curiam) ("We are barred by the *Stone* doctrine from considering [Petitioner]'s claim if he had a 'full and fair opportunity' to litigate his Fourth Amendment claims in the state courts."); *see also Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996) (explaining that relevant inquiry is whether petitioner had chance to litigate claim, not whether he did so or whether claim was correctly decided).

Petitioner's objections to Ground One are overruled, and the Report and Recommendation is adopted with respect to Ground One.

**B.     Ground Two**

Petitioner objects to the Report and Recommendation's conclusion that the "full" GPS logs that Petitioner believes were suppressed by the Government were either nonexistent or not actually suppressed. (*See* Obj. at 11.) As noted in the Report and

Recommendation, "[a] GPS log comprised of twenty to thirty pages was admitted at trial." (R. & R. at 26.) "The first date of [the first] log was March 2, 2011," and covered a period of approximately three weeks. (*Id.*) The first date of the second log was May 25, 2011, and the last date was June 10. (*Id.*) The parties stipulated that only the first and last pages of the second log would be introduced.[6] (*Id.*)

In his Objections, Petitioner merely repeats speculative claims from his Petition, that he was denied access to the "full" GPS logs, and that those logs are "material to his innocence." (Pet. at 7.) But the GPS monitor was removed prior to October 21, 2011 (the date of the burglary), and a second GPS monitor was only placed on Petitioner's truck following the burglary in order to trace the truck's movements and locate its driver. (*See, e.g.*, Doc. 19-1, Ex. JJ at 95–96 (explaining that GPS was placed on Petitioner's truck after burglary).) The Court therefore concludes that Petitioner has failed to establish a colorable *Brady*[7] violation.[8] (*See* R. & R. at 26–27.)

Petitioner's objections to Ground Two are overruled, and the Report and Recommendation is adopted with respect to Ground Two.

**C.  Ground Three**

Petitioner objects to the Report and Recommendation's conclusion that "his sentence did not run afoul of *Apprendi* and *Blakely*." (R. & R. at 30; *see* Obj. at 13.) But Petitioner is incorrect. Petitioner's enhanced sentence is properly "based on the fact of his prior convictions." (R. & R. at 30; *see id.* at 27–30 (discussing the aggravating factor of

---

[6] The record indicates that complete versions of the both the first and second logs were disclosed to the defense during discovery. (R. & R. at 26.)
[7] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that the government violates defendant's due process rights when it fails to disclose evidence material to defendant's guilt or innocence).
[8] Under a separate heading entitled, "Duty to Disclose," Petitioner argues that the Report and Recommendation incorrectly concludes that the SPD "did not have control over the vehicle or its contents." (Obj. at 12.) Petitioner argues that said conclusion contravenes "*Agurs*, *Trombetta*, or *Brady*. Because when prosecutors are made aware of defen[s]e requested evidence that is reasonably easy for the [S]tate to gather but is in the hands of one of its agent[s] [the towing company][,] it would be far to[o] tempting to do nothing and allow the at risk requested material evidence to be destroyed . . . ." (*Id.*) Petitioner then provides a list of "requested evidence" that the Government allegedly failed to disclose. (*See id.*) The Court, however, agrees with the Government that the function of this particular section is unclear because it does not specifically address any part of the Report and Recommendation. (*See* Resp. at 6.)

Petitioner's prior convictions)); *see also Apprendi*, 530 U.S. at 490 ("*Other than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.") (emphasis added); *State v. Martinez*, 115 P.3d 618, 625 (Ariz. 2005) ("Under A.R.S. § 13-702, the existence of a single aggravating factor exposes a defendant to an aggravated sentence.").

Petitioner's objections to Ground Three are overruled, and the Report and Recommendation is adopted with respect to Ground Three.

## IV. CONCLUSION

Having reviewed the record de novo, the Court agrees with the Report and Recommendation's conclusion that Grounds One, Two, and Three should be denied on the merits.[9] The Court adopts the Report and Recommendation and denies the Petition without prejudice.

**IT IS ORDERED** overruling the Objections to the Magistrate Judge's Report and Recommendation (Doc. 39).

**IT IS FURTHER ORDERED** adopting the Report and Recommendation of the Magistrate Judge as the Order of this Court (Doc. 38).

**IT IS FURTHER ORDERED** denying Petitioner's Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody (Doc. 1).

**IT IS FURTHER ORDERED** denying any Certificate of Appealability because Petitioner has not made a substantial showing of the denial of a constitutional right.

**IT IS FURTHER ORDERED** directing the Clerk to enter judgment accordingly.

Dated this 6th day of January, 2020.

_____
Susan R. Bolton
United States District Judge

---

[9] Petitioner does not object to the Report and Recommendation's conclusions with respect to Grounds Four and Five. (*See* Obj.)

- 12 -